United States District Court
Southern District of New York

Granville Navigation S.A.
    Plaintiff

v.

                                        07 CV 9823 (CM)
                                        DECLARATION IN
                                        OPPOSITION TO MOTION
                                        TO VACATE OR REDUCE
                                        MARITIME ATTACHMENT

Transgrain Shipping (Singapore) Pte Ltd
    Defendant

MARIA STAVROPOULOU deposes and says:

1. I am a solicitor of the Supreme Court of England and Wales, employed in the firm of Hill Dickinson International in Greece which deals with all aspects of shipping law and international trade. I am duly authorised by the plaintiffs to make this declaration in response to Mr Timothy Hill's 12th February 2008 declaration in relation to this matter.

2. Further to our review of Mr Hill's elaborate analysis of the measure of damages under English law, we would like to make the following comments:

3. The details of the voyage Charterparty with Transgrain Shipping (Singapore) Pte Ltd (hereafter referred to as "**the Defendants**"), pursuant to which this claim has been brought have been set out in Mr Hill's statement.

4. The Defendants cancelled the Charterparty by an email to the Managers of the Vessel, Messrs. Clio Navigation on 18th September 2007 (please refer to **Attachment 1**). At the time of cancellation, the Vessel was positioned and ready to pass the Suez Canal. As per usual shipping practice, the Owners had made all the relevant arrangements for passing the Suez Canal including the payment of US$ 140,582 to their agents at Port Said on 17th September 2007 (please refer to the request of fund transfer in this amount made by the managers of the Vessel dated 17/09/07 in **Attachment 2**).

5. Thereafter, the managers of the Vessel sent several messages to the Defendants requesting confirmation that the Charterparty was to be considered as cancelled and that they did not wish to proceed with the said Charterparty any longer (please refer to **Attachment 3**). The Defendants did not reply to these messages and neither did they contest the cancellation. In order to mitigate their losses resulting from the cancellation, the Plaintiffs immediately started making inquiries to obtain alternative employment for their Vessel.

6. It was to be taken into account that the age of the Vessel, its size and the fact that it was to be fixed as "gearless" meant that the search for

1

alternative employment would not be an easy task. The positioning of the Vessel at the time of cancellation, gave rise to three alternatives, namely: (a) to travel for an additional 12 – 13 days in ballast to the Persian Gulf where the freight rates may have been higher- this would have taken more time and would have been more costly because further expenses would have been incurred to travel there; (b) to fix the Vessel in the Red Sea –this would have resulted in major losses as the freight rates in that region were low; or (c) to seek an alternative fixture at a port in the Black Sea as with the Transgrain charterparty. It was decided to follow the third option because the Plaintiffs wanted to avoid wasting more time and because, commercially, it was the best course of action under the prevailing circumstances.

7. They began negotiations with DELTA MARITIME AGENCY on 19th September 2007 which led to a clean fixture recap on 20th September 2007 (please refer to **Attachment 4** which also includes the signed charterparty with Delta Maritime Agency). The agreement provided for the shipping of 31,500 MT of wheat in bulk from Novorossiysk to Egypt. The freight rate was at **US$36.75/ MT** which was considerably less than the freight rate agreed under the Transgrain charterparty for the shipment of wheat at **US$45/MT** (for Voyage 1) and **US$45.50/MT** (for Voyage 2). It is to be noted, that although the Vessel had the capacity to load a total of 42,000MT of wheat (according to the stowage factor of this grain), Delta Maritime could only provide 31,500 MT of cargo. However, the Plaintiffs agreed to the new fixture on the basis of a commercial decision based upon the considerations explained in paragraph 6 above.

8. Based on the above factual analysis, it can be clearly seen that the Owners acted promptly to mitigate their losses as best as possible in finding alternative employment for their Vessel under the circumstances, albeit at a lower freight and with a cargo which was considerably less than the full loading capacity of their Vessel.

9. We agree with paragraph 9 of Mr. Hill's declaration that the calculation of damages under English law is reasonably settled and is stated in the authority sighted therein, namely Voyage Charters 3rd Edition.

10. As seen from **Attachments 5 and 6**, the calculated time charterparty equivalent rate (TCE) in this instance, on the basis of English law principles, amounts to US$ 22,718 per day for Voyage 1 and US$ 29,947 per day for the Voyage 2 under the Transgrain Charterparty giving an average of **US$ 26,332.50** per day.

11. When Plaintiffs had originally calculated the damages arising from this cancellation, we had calculated the total losses incurred up to the point of re-fixing the Vessel on 20th September, that is the losses over a period of 14.830 days. However, the total duration of the Transgrain charterparty was for a total of 70 days. In fact the Plaintiffs had underestimated their claim by some 55 days. What needs to be

2

considered is that in the remaining period of the Transgrain fixture the Vessel was fixed with DELTA at a lower freight. Plaintiffs have calculated that the time charterparty equivalent rate for the Delta charterparty amounted to US$21,236 (please refer to **Attachment 7**. This means that the Plaintiffs were losing US$ 5,096.50 per day for the remaining period of the charterparty (which coincided with the total number of days of the DELTA charterparty). When taking into account all of the hire losses for the entire duration of the charterparty the total is **US$ 612,119** as calculated in **Attachment 8**.

12. In addition the Plaintiffs are entitled to recover the following losses which had been incurred and paid for by them up to the point of cancellation:

    (i) **Cost of transiting the Suez Canal: US$ US$140,582**
    With regards to the Port of Suez dues claimed at discussed in paragraph 4 above, this was an amount of money that had to paid by the Plaintiffs in advance to the Port Said Authorities in order to the Vessel; to obtain permission to cross the Canal. This is in accordance with good shipping practice. The payment as shown from the payment instructions in **Attachment 2** was made on the 17th September- that is <u>one day</u> prior to the Vessel's cancellation and for this reason it should be recoverable. In the event that this obligation was not met in time, the Vessel would have suffered unreasonable delays at the Suez Canal. Likewise, if the Charterers had cancelled the contract well before the Vessel's proximity to the Suez Canal, the Plaintiffs may not have paid this amount to the Port Said Authorities in anticipation of the passing, and may have made other arrangements.

    (ii) **Bunkers consumed up to the point of Cancellation**
    In relation to the bunkers consumed up to the point of cancellation, our view is that there are circumstances where these can be recoverable, thus the position is not entirely clear under English law. In this case we submit that the bunkers are recoverable as a separate sum, since it was an expense that was specifically incurred and paid for by the Owners but for which they did not receive anything from the Defendants as compensation. This will be a question for the arbitration Tribunal to decide upon.

    (iii) **Ballast Bonus at US$200,000**
    Lastly, turning to the issue of the ballast bonus, it is to be noted that the ballast bonus was an express term of the Charterparty between the Plaintiffs and the Defendants on page 3 of the fixture recap which reads: **"FREIGHT USD 45,- PER MTON BASIS DISCHARGE JEDDAH OR YANBU FIOT PLUS 200,000USD BALLAST BONUS TO BE PAID AFTER COMPLETION OF DISCHARGE AND VESSEL SAILING FROM DAHEJ"**. As such the right to the ballast bonus accrued to the Plaintiffs as soon as the Vessel sailed from the port of Dahej and the Defendants failed to meet that obligation, and in so doing acted in breach of

3

contract. We quote from Chitty on Contract, section 21-051 (page 1401) that "*Rights and obligations which arise from the partial execution of the contract and causes of action which have accrued from its breach alike continue unaffected*". As such, the ballast bonus should be recoverable. It is to be noted that for this reason the ballast bonus has not been included as income in the calculation of the TCE in the first voyage of the Transgrain charterparty **(Attachment 5)**.

13. Based on the information above, it is our position that the calculation of damages incurred by the Plaintiffs as a result of the Defendants' cancellation, was carried out in accordance with English law principles. We consider it to be unreasonable to request a reduction of the maritime attachment as the calculations in **Attachment 8** show that the Plaintiffs' claim was in fact **underestimated** in the Verified Complaint. It is also clear from the evidence that, following from the unlawful cancellation by the Defendants, the Plaintiffs acted reasonably to mitigate their losses, they took action quickly and on the basis of the available options to them they chose what they felt was best in order to minimise their losses under the circumstances. This is all that English law requires of a Plaintiff.

14. Pursuant to settled English law, Plaintiffs' mitigation efforts were clearly reasonable under the circumstances. Moreover, to the extent that Plaintiff's mitigation efforts are to be judged, that issue is squarely governed by the parties' agreement to arbitrate disputes under the charterparty in London arbitration, and it is ultimately a question for the arbitrators to decide. This is supported in the well known English law authority for the measure of damages, McGregor on Damages ( please refer to the extract from section 7-016, page 221 in **Attachment 9),** where it is stated that "*In Payzu v. Saunders both Bankes and Scrutton LJJ said that the question of mitigation of damage is a question of fact; in The Solholt Sir John Donaldson M.R.said that "whether a loss is avoidable by reasonable action on the part of the claimant is a question of fact not law" and that "this was decided in Payzu v. Saunders". It has never been doubted since.*" Also in the Court of Appeal case of **Moore and Another v. DER Ltd**, (also shown in **Attachment 9**), it was held that "Although a plaintiff who had suffered damage for which the defendant was liable was, in mitigating his loss, bound to act with the defendant's interest, in mind as well as his own, the only requirement was that he should act reasonably. *What was reasonable depended on the circumstances of each case and was a question of fact*".

Pursuant to 28 U.S.C. (paragraph 1746), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Piraeus, Greece this 27th day of February 2008.

**MARIA STAVROPOULOU**

4