United States District Court
Southern District of New York

Granville Navigation S.A.
    Plaintiff

07 CV 9823 (CM)

v

**DECLARATION IN OPPOSITION TO MOTION TO VACATE OR REDUCE MARITIME ATTACHMENT**

Transgrain Shipping (Singapore) Pte Ltd.
    Defendant

Mr. GAZIS THOMAS deposes and says:

1. I am the Chartering Manager of ROYAL MARITIME INC., a marine charter brokerage firm located in Piraeus, Greece. I have been working in charter brokering for approximately 13 years. The Declaration is made on behalf of Plaintiffs, Granville Navigation SA and in opposition to the application made by Defendant Transgrain Shipping (Singapore) Pte Ltd to vacate or reduce the maritime attachment in this matter.

2. I have read the declaration prepared by Mr. Iraklis Katrakis in favour of Transgrain's application and would like to make the following comments:

COMPARISON WITH OTHER VESSELS ON TIME CHARTERS

3. The period for the negotiations to fix the vessel with alternative charterers following Transgrain's cancellation lasted between 18th September 2007 (date on which the charterparty had been cancelled) and 20th September 2007, when the clean fixture recap was drawn up. When one considers the market for that period of time it is true that there was generally a rising trend for **new** vessels on time charterparty, but this trend did not extend to vessels in the same category as CAMEL and in any event CAMEL was fixed on a **voyage charterparty**. However, when making comparisons it is crucial that one compares amongst vessels in the same category, having the same specifications – that is with the same year of build, gross tonnage, particulars (e.g. gears, holds), fuel consumption, area of trading and the vessel's position when fixed.

4. The CAMEL is a 1978 built, self-trimming, single deck bulk carrier of 26,194 gross tonnage, with six hatches and was fixed as gearless. It also had a heavy fuel consumption on a daily basis,

1

compared with other newer vessels- that being "IFO 28 mt in laden condition, 27 mt in ballast condition and marine gas oil ("MGO") of 3,2 mt + 1 mt IFO in port and 2,5 mt of MDO when idle at a speed of 11 knots (and not 12 knots at 27 mt IFO as stated by Mr Katrakis) - Please refer to the fixture recap with Transgrain and charterparty forming part thereof in **Attachment 1**. Also the fuel prices at the time ranged at approximately USD 420 /MT of IFO and USD 710/MT of MGO.

5. In this respect, Mr Katrakis' allegation in his paragraph 15, that *"there is no reason the CAMEL could not have earned at least $50,000 per day"* is incorrect as he has failed to compare CAMEL with other Vessels in the same category. For example, none of the vessels listed in Mr. Katrakis list are built in 1978 – the oldest vessels listed are 1983 built but of different specifications and as such Mr. Katrakis' comparison is not valid. For example, the EUGENIA B earning $65,000 daily is a 1998 built, the YONG AN 3 earning $62,500 daily is a 1996 built, the DARYA RANI earning $60,000 daily is a 1996 built and the DUBAI FORTUNE and the ARHIMIDIS SB which are both built in 1995 and are 42850 metric tonnes and 45320 metric tonnes respectively, earned the same hire rate at $55,000 daily.

6. To give a clear example of the above, I would like to refer the Court to the following vessels (as listed in **Attachment 2**) which had been fixed by Transgrain, namely:

   M/V ARISTON-built 1984-37052GRT-fixed Sep. 1-5 at 39,000/day and

   M/V CRYSTAL SEAS-built 1995-43222 GRT-Fixed Aug. 30-31 at 63000/day.

   It can be seen that the age and size of these vessels determined the hire rate at which they were fixed by the same Charterers since the **m.v ARISTON** was fixed at approximately half the rate of **m.v CRYSTAL SEAS**. Mr Katrakis has failed to consider these factors.

7. The Charterers cancelled just before the Vessel's passing of the Suez Canal on 18th September 2007. It is crucial to note that at the time of cancellation it was very difficult to find employment in the area, at the same freight rate and for the same cargo as the fixture with Transgrain. For this reason, after the Charterers' message of September 18th 2007, we had sent several messages to the Charterers (please refer to **Attachment 3**) requesting their confirmation in writing that they wished to cancel the charterparty, before starting to look for alternative employment.

8. The Owners had the option of travelling for an additional 12-13 days in ballast to the Persian Gulf where the freight rates may have been higher, but this meant that during these 12-13 days

more time would have been wasted and more losses incurred without any secured employment at a higher freight. If the Vessel was to be fixed in the area of the Red Sea the freight rate would have been extremely low and as such the Owners did not believe this option was reasonable. It was therefore preferable for the Owners to find employment with loading at a port in the Black Sea with the hope that they would employ the Vessel at similar rates to those of Transgrain as quickly as possible.

9. The only Charterers that we could find were Messrs DELTA MARITIME, who were interested in shipping 28500 - 31500 MT of wheat in bulk from Novorossiysk to Egypt. (Please refer to fixture recap and the charterparty in **Attachment 4**). Although the freight rate was relatively low, we felt that it was commercially wise to fix the Vessel as soon as possible.

10. The new fixture was for the transportation of 31,500MT of wheat, at a freight rate of US$ 36.75per metric tonne. This was considerably less than the freight rates agreed with Transgrain for the transportation of barley at US$ 45/MT for Voyage 1 and US$ 45.50/MT for Voyage 2.

## WRONG CALCULATION OF THE HIRE EQUIVALENT RATE

11. When making a comparison between earnings on a voyage charterparty and a time charterparty, one would first need to calculate a time charterparty equivalent rate (TCE) which would enable the comparison between a Vessel earning freight and another earning hire. Although I agree with the general method of calculating the TCE applied by Mr Katrakis, the result is wrong due to the following reasons:

(i) He has failed to deduct the commission payable under the charterparty at 3,75%, and

(ii) Although his calculations concede that the estimated time for both voyages scheduled under the Transgrain charterparty which would have taken a total of approximately 70 days, the calculation for the IFO consumed, includes only a total of 15 days. This is clearly wrong since, according to our estimated calculations, the estimated total number of days at sea for the first voyage is 24 and the total number of days at sea for the second voyage is 15, thus a grand total for both voyages of 39 days. The correct calculation of Mr. Katrakis should read : 39 x 27 x 420 = 442,260.

(iii) When the correct amounts are inserted in Mr. Katrakis' calculations (please refer to the table in **Attachment 5**), the estimated time charter rate equivalent is much lower at **USD 28,291/day.** It is to be noted that although the Suez Canal transits and the bunker expenses are deducted from the total revenue in order to calculate the time charter equivalent, this does not mean that these amounts cannot be recovered separately since these were amounts that had

3

been incurred and paid for prior to the cancellation of the charterparty.

12. Based on the above analysis, I firmly believe that the analysis put forward by Mr Katrakis is not correct, for the following reasons:

(i) The comparison made by Mr. Katrakis using other vessels is not representative as the vessels that he states in his list have no similarity whatsoever with MV CAMEL.

(ii) The calculation made by Mr. Katrakis to find the time charter equivalent is wrong.

(iii) The alternative employment of M/V CAMEL was at a lower freight than the original fixture with Transgrain, and as a result, the plaintiffs suffered losses and damages.

Pursuant to 28 U.S.C. (paragraph 1746), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Athens, Greece this ..28th..of February 2008.

THOMAS GAZIS