569-07/DPM/MAM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
GRANVILLE NAVIGATION S.A.,

                                    Plaintiff,

   -against-

TRANSGRAIN SHIPPING (SINGAPORE)
PTE. LTD.,                                              **07 CIV 9823 (CM)**

                                    Defendant.
-------------------------------------------------------------------x

## MEMORANDUM OF LAW OF PLAINTIFF GRANVILLE NAVIGATION S.A. IN OPPOSITION TO THE MOTION TO VACATE OR TO REDUCE ATTACHMENT OF DEFENDANT TRANSGRAIN SHIPPING (SINGAPORE) PTE. LTD.

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900

Of Counsel
Don P. Murnane, Jr.
Manuel A. Molina

NYDOCS1/299777.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

PRELIMINARY STATEMENT ............................................................1

BACKGROUND FACTS...................................................................2

ARGUMENT

    POINT I

    VACATUR: PLAINTIFF HAS SATISFIED ITS BURDEN OF PROOF
    UNDER RULE E(4)(f) AND THE ATTACHMENTS MUST
    THEREFORE BE MAINTAINED...............................................3

    POINT II

    REDUCTION: DEFENDANT HAS NOT SHOWN GOOD CAUSE
    WHY THE ORDER OF ATTACHMENT SHOULD BE REDUCED
    AND IMPROPERLY SEEKS A FACT-INTENSIVE INQUIRY INTO
    THE DAMAGES CLAIMED BY PLAINTIFF...................................5

        A. Plaintiff's claim for damages is not frivolous; instead
           it is well supported ......................................................6

        B. The reduction challenges are moot to the extent they are
           offset by Plaintiff's original underestimation
           of its loss of use ........................................................8

        C. "Second-guessing" Plaintiff's mitigation efforts is
           not an issue for this Court .............................................9

        D. Defendant has miscalculated the Time Charter
           Equivalent...............................................................16

CONCLUSION.............................................................................17

## TABLE OF AUTHORITIES

Cases

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*,
460 F.3d 434 (2d Cir)................................................................................................... 3

*Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*,
No. 05-7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005...........................15, 16

*Dolco Inves. Ltd. v. Moonriver Dev. Ltd.*,
486 F. Supp. 2d 261 (S.D.N.Y. 2007) .......................................................................... 3

*Dongbu Express Co. Ltd. v. Navios Corp.*,
944 F. Supp. 235 (S.D.N.Y. 1996) ............................................................................ 5, 16

*Ronda Ship Management Inc. v. Doha Asian Games Organising Committee*,
511 F. Supp. 2d 399, (S.D.N.Y. 2007)...................................................... 4,-6, 14-15

*Sea Transport Contractors Ltd. v. Industries Chemiques du Senegal*,
 411 F. Supp. 2d 386 (S.D.N.Y. 2006)..........................................................................14

*The Rice Co. v. Express Sea Transport Corp.*,
No. 07-7077, 2007 U.S. Dist. LEXIS 84300(S.D.NY. Nov. 15, 2007)...................... *passim*

*Tide Line, Inc. v. Eastrade Commodities, Inc.*,
No. 06-1979, 2006 U.S. Dist. LEXIS 95870 (S.D.NY. Aug. 15, 2006) ........................... 3, 4

*Transportes Navieros y Terrestres, S.A. de C.V. v. Fairmount Heavy
Transport N.V.*, No. 07-3076, 2007 U.S. Dist. LEXIS 50260
(S.D.N.Y. July 6, 2007)........................ .............. ............. .......... ............. ...................... 3, 5, 13

Plaintiff GRANVILLE NAVIGATION S.A. ("Plaintiff"), by and through its counsel, Freehill Hogan & Mahar, LLP, hereby submits this memorandum of law in opposition to the motion of Defendant TRANSGRAIN SHIPPING (SINGAPORE) PTE. LTD. ("Defendant") to vacate or to reduce the attachment.

## PRELIMINARY STATEMENT

At the outset, it is significant to point out that, although Defendant ostensibly characterizes its motion as one to vacate or to reduce the attachment, its application to the Court does not challenge the validity of Plaintiff's Rule B attachment, only the quantum. Defendant's attack is limited to criticizing plaintiff's successful mitigation efforts stemming from Defendant's repudiation of the charter party and the precise amount of damages Plaintiff seeks to prove in London arbitration proceedings now underway in England. The nature of Defendant's attack is crucial because it determines the nature and quality of proof that Plaintiff must adduce to defeat Defendant's motion.

On a motion to reduce the amount of a Rule B attachment, Defendant is required to show good cause exists whereas the Plaintiff need only establish that its damages are non-frivolous. When carefully scrutinized, however, Defendant's motion is a substantive attack on the merits of Plaintiff's claims which impermissibly requests the Court to perform a full-blown, fact-intensive damages inquiry, a task reserved for London arbitrators per the parties' agreement to arbitrate.

Defendant readily concedes that the adjudication on the merits of the parties' dispute is for London arbitrators, applying English law. The very fact that Defendant has been forced to argue substantive factual evidence in an effort to reduce Plaintiff's damages – damages that are based on an ***actual*** substitute charter party – compellingly illustrates the weakness and futility of Defendant's challenge herein.

NYDOCS1/299561.1                           1

Moreover, the evidence adduced by Plaintiff in opposition to Defendant's motion establishes that Plaintiff in fact ***underestimated*** its damages by $204,071.55, by limiting its loss of use of the vessel to 15 days (the period of time between the date of delivery of the vessel to Defendant and the date the substitute employment for the vessel was found), rather than on the 70 days which, as Defendant admits in its papers, is the applicable period of time. This aspect alone renders moot Defendant's allegation that Plaintiff has overestimated its damages. Defendant's motion should therefore be denied in all respects.

## BACKGROUND FACTS

The relevant facts for the resolution of this motion are undisputed and straightforward. The Court is respectfully referred to the accompanying declaration of Maria Stavrapoulou and Thomas Gazis.

Plaintiff entered into a voyage charter party contract with defendant on or about August 29, 2007 for the use and operation of the M/V CAMEL by the Defendant. (Affidavit of Manuel A. Molina, dated February 28, 2008 ("Molina Af."), Ex. A, ¶4). The charter party called for two consecutive trips for the carriage of barley in bulk from the Black Sea to either Yanbu, Jeddah or Gizahn Ports at Defendant's option. (Molina Aff., Ex. A, ¶5). Defendant also agreed to pay Plaintiff a $200,000 ballast bonus upon delivery of the vessel to Defendant. (Molina Aff., Ex. A, ¶6).

Pursuant to the charter party, Defendant instructed the M/V CAMEL to proceed to the port of Novorrosiysk or Odessa or Sevastopol or Tuapse (in the Black Sea). (Molina Aff., Ex. A, ¶7). However, as the vessel proceeded to the Black Sea, Defendant cancelled the contract. (Molina Aff., Ex. A, ¶7). As a result of the breach, Plaintiff commenced London arbitration against the Defendant. (Molina Aff. Ex. A, ¶12). Plaintiff also brought the instant Rule B action

on November 6, 2007, seeking to obtain security in the sum of $1,220,695. This Court granted

Plaintiff's application and issued an Order of Attachment on November 8, 2007. (Molina Aff.,

Ex. B).   Pursuant to this Order, Plaintiff has restrained assets of the Defendant totaling

$545,911.53.

### POINT I

### VACATUR: PLAINTIFF HAS SATISFIED ITS BURDEN OF PROOF UNDER RULE E(4)(f) AND THE ATTACHMENTS MUST THEREFORE BE MAINTAINED

To sustain its burden and defeat a motion to vacate, Plaintiff only needs to demonstrate

that: (1) the cause of action arises within the Court's admiralty jurisdiction; (2) the Defendant

cannot be found within the District; and (3) the Defendant has property within this District. *Aqua

Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*, 460 F.3d 434 (2d Cir).

Although the *Aqua Stoli* Court did not exactly state what a plaintiff must show to meet

this burden, the majority of the courts of this district have adopted a *prima facie* standard. *Tide

Line, Inc. v. Eastrade Commodities, Inc.*, No. 06-1979, 2006 U.S. Dist. LEXIS 95870 (S.D.NY.

Aug. 15, 2006); *Transportes Navieros y Terrestres, S.A. de C.V. v. Fairmount Heavy Transport

N.V.*, No. 07-3076, 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007); *Dolco Inves. Ltd. v.

Moonriver Dev. Ltd.*, 486 F. Supp. 2d 261, 266 (S.D.N.Y. 2007).   Under this *prima facie*

standard, a Rule E(4)(f) hearing is not intended to, and should not, be a fact-intensive inquiry

into the underlying merits of plaintiff's claim (especially so where the dispute is subject to

arbitration).   All that the plaintiff needs to defeat a Rule E(4)(f) motion to vacate is a proper

verified complaint. *Tide Line*, 2006 U.S. Dist. LEXIS 95870, *15-16; *Transportes Navieros*,

2007 U.S. Dist. LEXIS 50260, *11.

As Chief Judge Wood has stated:

Thus to show that it has a *prima facie* claim, a plaintiff need not provide any supporting evidence; its complaint should suffice. Furthermore *Aqua Stoli* implies that a plaintiff is likewise ***not required to provide evidence*** showing that it has a claim against defendant to carry its burden under Supplemental Rule E(4)(f).

2006 U.S. Dist. LEXIS 95870, *15-16 (emphasis supplied).

This Court, in previously addressing this issue, has stated that it follows the majority view. *Ronda Ship Management Inc. v. Doha Asian Games Organising Committee*, 511 F. Supp. 2d 399, 403-4 (S.D.N.Y. 2007) (citing *Tide Line*, 2006 U.S. Dist. LEXIS 95870, *17). In *Ronda*, this Court held that, when considering the adequacy of a claim in a maritime vacatur motion, "the *prima facie* standard in the maritime attachment context is a pleading requirement, not an evidentiary standard, and differs from the use of that phrase in other contexts;" hence, "[u]nder this standard, the Court ***looks only to the Complaint*** to determine whether the plaintiff has alleged a valid admiralty claim against the defendant." *Id.* (emphasis supplied). The Court went on to add:

> While the defendant can argue that the plaintiff does not have a valid prima facie admiralty claim against the defendant, the basis of ***the argument cannot be that the plaintiff has not provided sufficient evidence of such a claim***. Instead, the defendant must argue that "plaintiff's pleadings are themselves insufficient to state such a claim." ***The Court will only look to plaintiff's pleadings*** to determine whether it has demonstrated "an in personam claim against Defendant[] which is cognizable in admiralty."

511 F. Supp. at 404 (citations omitted; emphasis supplied).

Here, Plaintiff's Verified Complaint asserts a classic maritime claim that Defendant wrongfully repudiated a charter party that required two consecutive voyages for the carriage of barley in bulk from the Black Sea to either Yanbu, Jeddah or Gizan Ports, at defendants option. (Molina Aff., Ex. A, ¶¶5, 7). Defendant does not contest that this allegation sets forth a valid

admiralty claim, and thus, it is undisputed that Plaintiff's claim is based on a breach of a maritime contract, and hence cognizable in admiralty.

Plaintiff also asserts in the Verified Complaint that the Defendant cannot be found within the District. (Molina Aff., Ex. A, ¶14). Defendant also does not contest this allegation.

Finally, Plaintiff has attached property of the Defendant located within this District. Defendant also does not contest this fact.

Accordingly, it is clear that Plaintiff has satisfied its burden of proof that the challenged attachments should be maintained. Therefore, that portion of Defendant's motion that seeks a vacatur of the attachment should be denied in its entirety. *The Rice Co. v. Express Sea Transport Corp.*, No. 07-7077, 2007 U.S. Dist. LEXIS 84300, *5 (S.D.NY. Nov. 15, 2007); *Ronda*, 511 F. Supp. at 403-05; *Transportes Navieros*, 2007 U.S. Dist LEXIS 50260, *12.

## POINT II

### REDUCTION: DEFENDANT HAS NOT SHOWN GOOD CAUSE WHY THE ORDER OF ATTACHMENT SHOULD BE REDUCED AND IMPROPERLY SEEKS A FACT-INTENSIVE INQUIRY INTO THE DAMAGES CLAIMED BY PLAINTIFF

As demonstrated above, Defendant does not seek to vacate the attachment but merely to reduce the amount of security obtainable in this Rule B action.    Rule E(6) thus governs and provides the applicable standard: "whenever security is taken the court may, on motion and hearing, for ***good cause shown***, reduce the amount of security given." Supplemental Admiralty Rule E(6) (emphasis supplied).  It is settled that plaintiff "need not prove its damages with exactitude" but only that its damages "are not frivolous." *The Rice Co.*, 2007 U.S. Dist. LEXIS 84300, *8; *Dongbu Express Co. Ltd. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996). Once Plaintiff establishes through its pleadings that the damages for which it seeks security are

not frivolous, Defendant's motion fails. *Ronda*, 511 F. Supp. 2d at 406 (court denying in part

and granting in part motion to redue solely on the basis of factual assertions in complaint); *The*

*Rice Co.*, 2007 U.S. Dist. LEXIS 84300, *8 (denying motion to reduce when factual evidence of

damages is disputed).

### A. Plaintiff's claim for damages is not frivolous; instead, it is well supported.

Plaintiff's Verified Complaint unambiguously reveals that Plaintiff has sought security

for the following damages:

- Claim for lost ballast bonus in the sum of $200,000, which, under the terms of the subject charter party, Defendant agreed to pay to Plaintiff upon delivery of the vessel. (Molina Aff., Ex. A, ¶¶6, 15(a)).

- Claim for costs of the vessel's passing through the Suez Canal in the sum of $140,582. (Molina Aff., Ex. A, ¶15(b)).

- Claim for bunkers consumed by the vessel en route to the loading port in the sum of $188,706. (Molina Aff., Ex. A, ¶15(c)).

- Claim for lost profits sustained by Plaintiff as a result of Defendant's wrongful repudiation of the subject charter party in the sum of $408,047.45, which amount has been calculated by multiplying (a) the number of days (14.83) the vessel was unused before Plaintiff it began operations under the substitute charter party by (b) the differential between the freight which Defendant would have paid under the subject charter party and the freight actually paid by the substitute charterer ($27,515). (Molina Aff., Ex. A, ¶¶9, 15(d)).

- Claim for Interest in the sum of $183,359.85, calculated on the above claims at the rate of 6% per annum compounded quarterly, for three years, the time Plaintiff's English solicitors estimate will take to obtain a final arbitration award, which interest is recoverable under English law (Molina Aff., Ex. A, ¶15(e)); and

- Claim for the sum of $100,000 representing legal fees and costs that will be incurred by Plaintiff in respect of London arbitration proceedings, as estimated by Plaintiff's English solicitors, which costs are recoverable under English law. (Molina Aff., Ex. A, ¶15(f)).

Before addressing Defendant's quantum challenge, it is important to first determine what

Defendant does not dispute. First, Defendant does not dispute the estimated legal fees/costs of

London arbitration or the applicable rate of interest and period of time estimated for Plaintiff to obtain a final arbitration award. Accordingly, Plaintiff is entitled to seek security for these claims.

Second, with respect to Plaintiff's claim for the lost ballast bonus, Defendant's own English counsel, Mr. Hill, concedes that Plaintiff's position is supported by English law because such an obligation could be interpreted as having arisen before the contract was terminated. He states: "Thus [Defendant] would remain under an obligation to pay the ballast bonus and the owners *could claim it as a separate sum*. See generally Chitty 29th ed 24-051)." (Hill Declaration, ¶¶20-21; emphasis supplied). Mr. Hill further concedes that "the question of whether [Plaintiff is] entitled to recovery of the ballast bonus payment *as a separate item without giving credit for any profit under the substituted charterparty is something for the arbitral tribunal to decide* in due course." (Hill Decl., ¶23). Therefore, by Defendant's own admissions, Plaintiff's right to claim the ballast bonus as an independent item of damage is clearly not frivolous. To the contrary, it is supported by English law, and in any event must ultimately be decided by the London arbitrators. *See Ronda*, 511 F. Supp. 2d at 406 (refusing to reduce amount of attachment on argument that contract subject to English law precludes recovery of indirect/consequential damages asserted in complaint, as "[i]t is not for this Court to decide whether incidental and consequential damages are recoverable under the charter parties at issue, but rather for the English court to resolve in due course"). Accordingly, Plaintiff's claim for the lost ballast bonus is not frivolous and Plaintiff is entitled to seek security for this amount.

Essentially, Defendant's challenge is thus limited to attacking the claims for the Suez Canal expenses and the bunkers consumed by the vessel in sailing to the loading port. But these too are clearly, and at best, issues for the English arbitrators. These components of Plaintiff's

claim are not frivolous as established by the evidence by Plaintiff's English counsel, Ms.

Stavropoulou, that because the Suez Canal expenses were paid by Plaintiff before the Defendant

cancelled the charter party, Plaintiff is entitled to recover this item of damage separately.

(Declaration of Maria Stavropoulou, dated February 28, 2008 ("Stavropoulou Decl."), ¶12(i)).

Further, as to the bunkers expense, Ms. Stavropoulou points out that this expense was incurred

by the Plaintiff and Defendant did not provide any reimbursement.    (Stavropoulou Decl.,

¶12(ii)).  Again, Plaintiff's claims for damages under English law are clearly non-frivolous, and

Defendant's attempt to excise these components of claim from the amount properly attachable

should be rejected.

**B.  The reduction challenges are moot to the extent they are offset by Plaintiff's original underestimation of its loss of use.**

The evidence Plaintiff submits in opposition to the motion establishes that Plaintiff

underestimated its damages by an additional $204,071.55.  At the time of the Verified Complaint

Plaintiff had calculated its damages based upon loss of use of just 15 days (14.83 days to be

more precise), *i.e.* the number of days from the time of delivery of the vessel to Defendant to the

time of the fixing of the substitute employment for the vessel. (Stavropoulou Decl., ¶¶10-11,

Attachments 5, 6, 7 and 8). Plaintiff, therefore, calculated its damages for lost profits at

$408,047.45.  In reality, Plaintiff should have calculated its damages, as conceded by Defendant,

over a period of 70 days, *i.e.* the estimated period of time for the duration of the cancelled

charter. (Katrakis Decl.,¶8).  Plaintiff has now calculated its damages for the entire duration of

the substitute charter, which was completed in 54 days. (Stavropoulou Decl., ¶11).   Thus,

Plaintiff's more accurate calculation reflects Plaintiff's loss of profits for: (1) the 15 days

beginning from the date of the delivery of the vessel to the date of the substitute fixture; and (2)

the additional 54 days that were not included in the Verified Complaint (the duration of the substitute charter) for a total loss amounting to $612,119.00, [or  $336,908 (14.830 days) + $275,211 (54 days substitute charter)], rather that the $408,047.45 claimed in the Verified Complaint. (Stavropoulou Decl., ¶11; Attachment 8).

## C.  "Second-guessing" Plaintiff's mitigation efforts is not an issue for this Court.

Defendant's English counsel, Mr. Hill, further concedes that under English law (as well as U.S. for that matter) "owners are obligated to mitigate their loss[;] [w]here the owners have accepted  the charterers' repudiation they must take *reasonable steps* to find alternative employment." (Hill Decl., ¶10; emphasis supplied). The "reasonableness" of a plaintiff's efforts to mitigate its damages is a fact-driven inquiry, dependent on the particular facts and circumstances of the case.  Disputes as to these facts are for the English arbitrators to decide per the parties' arbitration agreement.

In any event, Defendant speculates that Plaintiff did not suffer any damages and goes so far to say that, because of Defendant's breach, Plaintiff should have been able to earn more profits! This argument is without any merit and should be rejected by the Court. The Verified Complaint clearly demonstrates that Plaintiff suffered damages as a result of Defendant's breach and that its damages have been calculated based on the **actual** lower freight rate it obtained from the substitute employment of the vessel. Once Defendant challenges the factual allegations contained in Plaintiff's Complaint, Defendant's motion fails. *The Rice Co.*, 2007 U.S. Dist. LEXIS 84300, *8-9 (motion to reduce denied because there was factual dispute concerning applicable freight rate).

Here, the Verified Complaint asserts that, when Defendant breached, Plaintiff mitigated its damages by locating substitute employment for the CAMEL. Moreover, as Mr. Gazis

declares, Plaintiff located a substitute charterer within 2 days after they accepted Defendant's cancellation. (Declaration of Thomas Gazis, dated February 28, 2008 ("Gazis Decl."), ¶3). Thus, in arguing that Plaintiff should have been able to obtain a higher and better freight rate on the substitute charter, Defendant seeks evidence beyond the Complaint and requests this Court to conduct a fact-intensive inquiry into the propriety of Plaintiff's mitigation efforts.   This is an impermissible attack because the issue of whether or not Plaintiff properly mitigated damages is one for London arbitrators to adjudicate.  Indeed, the arbitrators will take into account the facts surrounding Plaintiff's mitigation efforts, the adjudication of the proper freight market benchmark for vessels of equivalent size, age and utility of the M/V CAMEL, expert testimony, etc. – the same inquiry this Court would make if it were the trier of fact on the merits. Defendant's submission of charts, data and a declaration that purportedly reflect "evidence" of what, in Defendant's view, the proper average freight market should be – which contrasts with Plaintiff's damages calculated on the basis of an **actual** substitute charter – goes well beyond the Complaint, and it is not evidence which this Court should evaluate contrary to the parties' agreement to arbitrate.

Crucially, in advancing its hyperbolic argument that the CAMEL's potential earning ability should have risen to $50,000 per day, Defendant has relied upon the **wrong facts**.  The parties do not dispute that when attempting to determine a vessel's earning potential factors such as the type of charter involved (time charter versus voyage charter party), the specific characteristics of the vessel, and the specific geographical location of the vessel at the time of the breach, must be taken into account. (Gazis Decl., ¶¶3-7).  Thus, it is important to compare "apples to apples," namely vessels of the same year of build, gross tonnage, particulars (*e.g.*

gears, holds) fuel consumption, trading area, and the vessel's position when fixed. (Gazis Decl., ¶3).

As Mr. Gazis' declaration clearly demonstrates, Defendant's "evidence" does not cite any vessels that are of equivalent age, size and utility as the M/V CAMEL:

- The CAMEL was built in 197. None of the vessels listed by Defendant was built in that year and the oldest vessels identified were built in 1983. For example, Defendant submits the EUGENIA B and the YONG AN 3, vessels built in 1996 and 1998 (some **20** years after the CAMEL). These newer vessels earned, respectively, daily charter hire rates of $65,000, $62,500. (Gazis Decl., ¶5).

- The CAMEL was fixed as "gearless," meaning that the vessel dod not possess self load/discharge capability. (Gazis Decl., ¶4).

- The CAMEL has a heavy fuel consumption on a daily basis. (Gazis Decl., ¶4).

- The CAMEL has a slower speed when idle (11 knots, not the 12 knots suggested by Defendant). (Gazis Decl., ¶4).

- Even the vessels that Defendant actually fixed during the relevant period of time demonstrate that the age and size of a vessel are important factors to consider when attempting to ascertain a prevailing market rate. (Gazis Decl., ¶4)

- At the time Defendant wrongfully repudiated the charter party, Plaintiff's vessel was located in the Middle East, and it was difficult to find substitute employment at the same freight rate and for the same cargo as the fixture with Defendant. (Gazis Decl., ¶7).

Moreover, at the time of Defendant's repudiation, three basic options were available to Plaintiff:

1. Direct the vessel to the Persian Gulf in the hope of obtaining substitute employment at a potential higher rate. This option posed the risk of losing 12-13 day of time while the vessel proceed to the Gulf, without any guaranteed employment at higher or equal rate.

2. Have the vessel fixed in the area of the Red Sea, which option would have forced the Plaintiff to accept an extremely low freight rate.

3. Direct the vessel to the loading port in the hope of obtaining substitute employment at potential similar rates to those of the cancelled charter.

(Gazis Decl., ¶8). Given the above options, Plaintiff reasonably believed that option #3, directing the vessel to the loading port in the hope of obtaining similar rates as the cancelled charter was the correct choice. The undisputed fact remains that Plaintiff, in exercising choice 3, found substitute employment within **2 days** of Defendant's repudiation, thereby eliminating further loss of use.

Clearly, the above facts contradict Defendant's purported "evidence" and establish that Plaintiff's claim for damages is not frivolous but well supported. Plaintiff has thus met its burden. *The Rice Co.*, 2007 U.S. Dist. LEXIS 84300, *8-9. In *The Rice Co.* case, defendant ship-owner canceled a charter party, with a rate of $24,500 per day, on the ground that plaintiff charterer had not made timely payments. Because of the cancellation, plaintiff was forced to accept an interim charter with the defendant at a higher rate of $28,500. Further, defendant offered plaintiff a new charter for the remainder of the original charter but with stricter payment conditions. Plaintiff rejected the offer and commenced London arbitration proceedings claiming damages against defendant for wrongful cancellation. Plaintiff calculated its damages by **estimating** a prevailing market rate of $36,409 per day for similar vessels. Plaintiff subsequently brought a Rule B action against defendant utilizing the estimated $36,409 freight rate. Following attachment of certain funds, defendant brought a motion to vacate and/or to reduce, much like the current challenge facing this Court. Defendant argued that the rate of $28,500/day was closer to the prevailing market rate. Judge Pauley denied the motion on the ground that plaintiff had presented sufficient evidence to support its claim that $36,409 was the prevailing market rate for similar vessels. The Court determined that plaintiff's estimate of damages was "non-frivolous" and thus at least created a factual dispute which precluded the reduction of the attachment. 2007 U.S. Dist. LEXIS 84300, *8-9.

Here, the facts are more compelling because (1) Plaintiff **actually** found substitute employment for the CAMEL, and (2) Plaintiff did not have to assume any average freight rate to calculate its damages.

Defendant misapplies the legal authorities upon which it relies to reduce the order of attachment. Careful examination of these case reveals they are easily factually distinguishable and do not support the Defendant's position. Indeed, all the cases cited share a common denominator: the courts did not face any fact-intensive inquiry **because the factual record was undisputed**. *See The Rice Co.*, 2007 U.S. Dist. LEXIS 84300, *9 ("Courts have reduced the damages where the plaintiff has offered no evidence to support its claim").

For example, in *Transportes Navieros*, Judge Preska granted a motion to reduce the amount of maritime attachment, which was based on the arrest of plaintiff's vessel by the defendant, because it was undisputed that plaintiff had failed to mitigate damages by doing absolutely nothing for six months to secure the vessel's release. Noting that a plaintiff's failure to mitigate damages can be considered good cause to reduce the amount of an attachment, the Court held:

> While the Court *declines* to engage in a fact-intensive inquiry based on its reading of *Aqua Stoli*, it is appropriate to recognize *an undisputed fact*, viz., that [plaintiff] was aware of the arrest for some six months before May 15, 2006, when [plaintiff] first contacted [defendant]'s Dutch counsel. As evidenced by the *undisputed fact* that the arrest was lifted within a day of [plaintiff]'s first contact with [defendant], it appears that [plaintiff] could have avoided virtually all of the damages it now claims had it acted promptly. . . . [I]t is undisputed that 1) the arrest was lifted one day after [plaintiff] first notified [defendant] of its ownership of the Vessel, and 2) the Vessel did not sail from the shipyard until July 27, 2006. Thus the Vessel did not sail until two months after the arrest was lifted. These *facts are not disputed* and may be examined by the Court *without engaging* in a fact-intensive inquiry into *the matters asserted in the Complaint*.

2007 U.S. Dist. LEXIS 50260, *16. Here, Defendant does not, and cannot allege that Plaintiff failed to mitigate damages. On the contrary, it is undisputed that Plaintiff was able to find a substitute charterer within **2 days** after Defendant wrongfully repudiated the subject charter party. A hotly contested challenge to the propriety or adequacy of Plaintiff's successful mitigation efforts, such as here, is beyond the scope of a motion seeking to reduce an attachment.

Similarly unavailing is Defendant's reliance on *Sea Transport Contractors Ltd. v. Industries Chemiques du Senegal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006). There, plaintiff sought security for damages which it claimed it would incur during a 30-year period. Defendant moved to reduce the attachment maintaining that the amount for security sought was overstated and contrary to the unambiguous terms of the contract that was alleged to have been breached. Plaintiff argued that the contract was meant to run "interminably" and therefore it could use 30 years as a proper benchmark period. Judge Casey rejected plaintiff's contention and granted the motion to reduce:

> The parties do not contest that the Court has the power, pursuant to Supplemental Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown. Here the Court finds that such a good cause exists. Even assuming the parties intended the Cooperation Contract to run "interminably," ***this cannot defeat the plain terms of the contract, which expressly states***: [This contract] has immediate effect from the time of signing, is valid for an initial period of two (2) years from the date hereof and is automatically renewed thereafter for further two (2) year periods on a rolling basis *unless either of the Parties has acted in material breach of their obligations hereunder* and have failed to remedy that breach . . . . The ***verified complaint alleges*** that [defendant] is in material breach of the Cooperation Contract and that it did not remedy the breach within the time period required by the contracts terms. As such, the contract will expire in two years.

411 F. Supp. 2d at 396. (italics in the original; bold and underline supplied). It is evident that Judge Casey refused to engage in a fact-intensive inquiry, and simply compared the allegations in the complaint against the unambiguous terms of the parties' contract.

In *Ronda*, a case not cited by the Defendant, this Court, in granting in part and rejecting in part defendant's motion to reduce the attachment, similarly did not conduct a fact intensive inquiry. The Court rejected defendant's argument that plaintiff was not entitled to consequential damages, as per the terms of the parties contract, because the issue of contract interpretation was one for the English court to adjudicate. By contrast, it agreed with defendant's argument that plaintiff's claims for damages for an alleged breach of a separate contract was "artificially inflated and speculative" because that charter party "***is not mentioned in the Complaint*** and the Court will reduce the attachment" by that amount. 511 F. Supp. at 406. Here, Plaintiff has alleged breach of a maritime contract, an allegation that has not been disputed by Defendant. Plaintiff has also established that it mitigated its damages by promptly locating substitute employment for the vessel and that it sustained losses because it earned less freight than it should have had the Defendant not breached the contract at issue, *i.e.* Plaintiff's lost profit calculation is based on an actual substitute charter. (Molina Aff., Ex. A, ¶9). If anything, Plaintiff has demonstrated that the purported prevailing market freight rate suggested by Defendant is "artificially inflated and speculative" in order to mislead the Court.

Equally contrary to Defendant's legal position is *Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, N0. 05-7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005). There, plaintiff had sub-chartered a vessel from a company called PanOcean which had charted the ship from owners. Plaintiff then sub-chartered the ship to defendant. Defendant returned the vessel prior to the time specified in the contract and plaintiff had to do the same, breaching in turn its contract with PanOcean. At the time the complaint was filed, arbitration proceedings in London down the chain of charter parties had commenced, and plaintiff expected that PanOcean would assert a claim against it for, *inter alia*, lost profits due to the early return of the vessel. As it did

not know what that claim would be, plaintiff, in its complaint, "***assumed***" a daily charter market rate of $8,000 for mitigation calculation purposes." 2005 U.S. Dist. LEXIS 22409, *4. Following the filing of the complaint, however, plaintiff revised its lost profit calculation against the defendant based upon the undisputed fact that PanOcean had asserted a claim against plaintiff and had utilized a daily market rate of $13,000. Thus in *Daeshin Shipping* the Court did not grant the defendant's motion to reduce the amount of the attachment – in fact, it denied it. The Court simply accepted the voluntary reduction by plaintiff because the $13,000 daily hire benchmark "was reasonable although not exact."

### D. Defendant has miscalculated the Time Charter Equivalent

It is not disputed that in order to determine the earnings on a voyage charter party to a time charter party, the time charter party equivalent ("TCE") must first be calculated. What is in dispute, given the facts and circumstances of this case, is the issue of whether or not the expenses that were actually incurred and paid for up to the point of cancellation can be recovered as a separate item of damage as opposed to those expenses that would have been incurred had the charter party not being cancelled (these are used in calculating the gross profits in the TCE calculation). Again, these issues are for the arbitrators to decide. (Stavropoulou Decl., ¶12). Further, as discussed above, the issue may be moot because Plaintiff underestimated its damages at the time the Verified Complaint was filed when Plaintiff did not account for the full period of time under which to calculate its total lost profits. (Stavropoulou Decl., ¶¶10-11; Attachments 5, 6, 7 and 8).

In any event, Defendant has miscalculated the TCE. As Mr. Gazis states, even if Plaintiff were to include the challenged bunker and Suez Canal expenses, Defendant has: (1) failed to deduct the commission payable under the cancelled charter party; and (2) underestimated the

NYDOCS1/299561.1                                    16

number of days the vessel would have been at sea at 15 days, rather than 39 days. Utilizing the

correct figures leads to a TEC of *$28,291* for the cancelled charter. Plaintiff's TCE calculation is

*$26,332.52*. (Stavropoulou Decl., ¶10. Attachments 5 and 6). Clearly, Plaintiff's estimate for

damages is not frivolous and Plaintiff is not required to calculate its damages with exactitude.

*The Rice Co.*, 2007 U.S. Dist. LEXIS 84300, *8; *Dongbu*, 944 F. Supp. 235, 237. The

Defendant's argument to reduce on this basis should thus be rejected.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court deny

Defendant's motion, direct that the challenged attachment remain in place, and award such other

and further relief as the Court may deem just and proper.

Dated: New York, New York
      February 28, 2008

                              FREEHILL, HOGAN & MAHAR LLP
                              Attorneys for Plaintiff
                              GRANVILLE NAVIGATION S.A.

            By: _____
                              Don P. Murnane, Jr. (DM 3639)
                              Manuel A. Molina (MM 1017)
                              80 Pine Street
                              New York, New York 10005
                              (212) 425-1900


TO:    BLANK ROME, LLP
       Attorneys for Defendant
       405 Lexington Avenue
       New York, N.Y. 10174

       Attn: Jack A. Greenbaum, Esq,
       (212) 885-5000

NYDOCS1/299561.1                    17