BLANK ROME, LLP
Attorneys for Defendant
Transgrain Shipping (Singapore) Pte. Ltd.
Jack A. Greenbaum (JG 0039)
405 Lexington Ave.
New York, N. Y. 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GRANVILLE NAVIGATION S.A.

    Plaintiff,

- v –

TRANSGRAIN SHIPPING (SINGAPORE) PTE. LTD.

    Defendant.

07 CV 9823 (CM)

**DECLARATION IN SUPPORT OF MOTION TO VACATE OR REDUCE MARITIME ATTACHMENT**

---

TIMOTHY HILL deposes and says:

1. I am an English barrister practising before the Courts of England and Wales. I was called to the Bar in October 1990. I specialise in all aspects of shipping law and international trade.

2. Pursuant to a voyage charter dated 29 August 2007, Granville Navigation SA chartered their vessel "CAMEL" to Transgrain Shipping (Singapore) Pte Ltd for two consecutive voyages to carry 40,000 mts 10% more or less in owners' option of barley from ports within the Black Sea to Yanbu, Jeddah or Gizan in charterers' option. The laycan for the first laden voyage was 20-30 September 2007. The second laden voyage was to follow in direct continuation after the first.

3.  The charter is governed by English law. There is a dispute between the parties as to whether Transgrain were in repudiatory breach of charter. At present I am not asked to advise on liability.

4.  I am asked my opinion as to the measure of damages on the assumption that Transgrain were in breach in cancelling the fixture.

5.  The charter was on FIOT terms. As one would expect, the freight rate under the charterparty differed depending upon the identity and number of discharge ports. The rate was slightly higher under the second voyage compared with the first.

6.  The only unusual term was "*ballast bonus to be paid after completion of discharge and vessel sailing from Dahej*". I assume that this was the vessel's final discharge port under her previous fixture. From Dahej in India the vessel would have to proceed through the Suez Canal to reach the Black Sea. This term is unusual because ballast bonuses are not normally earned until the vessel arrives at the first load port under the voyage charter concerned.

7.  I am told that, having departed Dahej and whilst en route to the Black Sea, the fixture was cancelled. I do not know whether or not the vessel had transited the Suez Canal prior to cancellation.

8.  I have not seen the terms of the pro forma charter "TGS/CAMEL CP DATED 17/4/07". This Advice assumes that there are no unusual terms in this pro forma and that the material provisions are set out in the main terms of the fixture recap.

9.  The law in relation to the calculation of damages is reasonably settled.

10. Where the charterers wholly fail to provide any cargo, the owners are deprived of the opportunity to earn freight and are entitled to claim the loss of anticipated profits under the charterparty. However, owners are obliged to mitigate their loss. Where the owners have accepted the charterers' repudiation they must take reasonable steps to find alternative employment.

11. The measure of damages recoverable by owners, where a charterer's breach deprives them of the opportunity to earn the chartered freight, is sometimes defined as the difference between the contract and the market rate of freight, thus reflecting the measure of damages recoverable in the case of a failure to accept and pay for goods for which there is an available market. In practice, however, there is rarely an available market in substitute charters, in the sense of sufficient cargoes to create a market and available for carriage from the same loading port, to the same destination and at the same time as the original chartered voyage. The ship will frequently have to proceed to a different loading port, and the substitute voyage will usually commence later than the original chartered voyage, and will finish later, and at a different port of destination. See generally *Voyage Charters* 3rd ed para 21.89.

12. In these circumstances, the damages are normally calculated by making a comparison between the gross profit (namely freight, demurrage and other charges, less voyage expenses) which the owner would have derived from the broken charterparty, and the gross profit which he has earned under the substitute charter or charters, the latter being apportioned so as to reflect the amount earned up to the date when the performance of the original charter would have been completed: *Voyage Charters* 3rd ed para 21.90.

13. The leading case is *The Noel Bay* [1989] 1 Lloyd's Rep 361. This establishes that the point of departure for the purposes of making this comparison is the date at which the owners accept the charterers' breach as a repudiation of the contract. When calculating the probable income under the original charter

and the date at which performance of that charter would have been completed, it is to be assumed that the performance of that charter would have commenced from that date.

14. In making the comparison, presumptions are made in the charterers' favour. For example, it is presumed that the charterers would have used the entire laydays allowable under the charter, even though they exceed the normal periods for loading and discharge at the ports in question. Further it is presumed that the charterers would have chosen to use ports which impose the greatest expense on the owners. However, if the owners can prove that demurrage would have been earned under the original charter, any such demurrage will be taken into account when calculating the damages for loss of profit.

15. As long as the owners have acted reasonably in mitigating their loss, the actual receipts under the substituted charterparty are used for the purposes of this comparison. However, if the owners have unreasonably delayed either in accepting the repudiation or in securing substitute employment, or have failed to take reasonable steps to secure the best available employment, the receipts under the substitute voyage are calculated on the assumption that the owners had acted reasonably.

16. It should be noted that the expense in proceeding to the loading port under the substitute charter is treated as an expense of the substitute voyage and is taken into account in the overall comparison: it is not recoverable separately.

17. In the event that at the end of the substitute voyage the ship is better (or worse) placed for future employment than she would have been had the chartered voyage been performed, then this is also taken into account for the purposes of the overall comparison.

18. I do not know what substitute fixture(s) the owners performed in this instance. However, I am told that the market rate rose rapidly after August 2007 and in all probability the substitute employment secured was far more lucrative than the charterparty with Transgrain.

19. I am unable to advise further at present in the absence of details of the substitute employment. However, in my view owners are <u>not</u> entitled to claim as a separate sum the cost of transiting the Suez Canal and the cost of bunkers consumed. These are simply expenses to be taken into account when determining the TCE under the charterparty that was not performed (or potentially the TCE under the substitute charterparty depending on when they were incurred). Thus whether or not owners have actually suffered any loss depends upon the substitute employment obtained, when it commenced and the freight rate under that substitute employment.

20. The position as regards the ballast bonus is more complicated as owners could argue that this payment became due and payable on the vessel sailing from Dahej. As such it would be an obligation arising before the contract was brought to an end which survives the owners' election to cancel the contract. Thus the Transgrain would remain under an obligation to pay the ballast bonus and the owners could claim it as a separate sum. See generally *Chitty* 29th ed 24-051.

21. This is supported by the approach in *Odfjfell Seachem A/S v Continentale des Petroles et Dinvestissements* [2004] EWHC 2929 (Comm). In *Odfjfell* it was held that demurrage payments which had accrued before termination could be recovered following termination of a charterparty over and above a claim for loss of profit. It should be noted that *The Noel Bay* also considered the issue of demurrage payments, although this is of limited assistance given that the majority decided the issue on the basis that the claim had not been properly pleaded.

128872.00601/6611124v.1

22. On the other hand Transgrain could argue that the ballast bonus payment should be treated differently in the instant case: the payment is clearly different in nature from damages for delay and in reality it is part of the overall payment regime under the charterparty for the carriage of the intended cargo. It would be commercially unattractive for the owners to seek to recover the ballast bonus payment as a windfall without giving credit for any profit they may have achieved on the substituted charterparty.

23. The question whether owners are entitled to pursue recovery of the ballast bonus payment as a separate item without giving credit for any profit under the substituted charterparty is something for the arbitral tribunal to decide in due course.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at London, England this 12 day of February 2008.

_____
TIMOTHY HILL