BLANK ROME, LLP
Attorneys for Defendant
Transgrain Shipping (Singapore) Pte. Ltd.
Jack A. Greenbaum (JG 0039)
405 Lexington Ave.
New York, N. Y. 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GRANVILLE NAVIGATION S.A.

      Plaintiff,

- v –

TRANSGRAIN SHIPPING (SINGAPORE)
PTE. LTD.

      Defendant.

---

07 CV 9823 (CM)

**DECLARATION IN SUPPORT OF
MOTION TO VACATE OR REDUCE
MARITIME ATTACHMENT**

KATRAKIS IRAKLIS deposes and says:

1. I am the chartering manager of SCAC Shipping SFA, a marine charter brokerage firm located in Colombes, France. I have been engaged in charter brokering for some 22 years. This Declaration is submitted in support of an application by defendant Transgrain Shipping (Singapore) Pte. Ltd. to vacate or reduce the maritime attachment in this matter.

2. The charter market generally, including handy size vessels such as the M/V CAMEL, rose steeply between the date of the charter which is the subject of this law suit, and the date when performance of the charter was to commence. As a result, the plaintiff ship owner presumably earned more money on substitute employment than it would have earned under the Transgrain charter party during the period of time the ship would have been employed under that charter.

128872.00601/6610627v.1

3. The M/V CAMEL is a 44,750 m.t. DWT "handy size" geared self-trimming vessel, with a grain capacity of 1,910,633 cubic feet. The ship is described in the charter as consuming 27 m.t. of intermediate fuel oil ("ifo") and 3 m.t. of marine gas oil ("mgo") at a speed of 12 knots, and 1 m.t. ifo plus 3 m.t. mgo in port. I have been provided a copy of the fixture confirmation of this charter, which is annexed as Ex. 1 to this Declaration.

4. The charter at issue was made on August 29, 2007 and provided for the performance of two consecutive voyages for the carriage of 40,000 m.t. bulk barley, +/- 10% at the ship owner's option, from the Black Sea to Saudi Arabia. The barley was represented to stow at 51 m.t. per cubic foot. The ship was to have been delivered between September 20 and 30, 2007. The freight rate was $45 per m.t. for the first voyage and $45.50 per m.t. for the second voyage, plus $2 per m.t. if the ship discharged at Gizan. Demurrage was $15,000 per day based on a loading rate of 8,000 m.t. per weather working day and a discharging rate of 3,000 m.t. per weather working day. The ship ballasted from the Arabian Gulf to the Black Sea, and the ship owner was to receive a $200,000 ballast bonus.

5. Freight under a "voyage charter," such as described above, is charged on a per ton basis. Because the freight rate will depend on the particular ports and duration of the voyage, it is necessary and customary to convert a freight rate to a "time charter equivalent" in order to make an "apples to apples" comparison of earnings on different charters or different voyages.

6. Under a time charter, "hire" is paid at a daily rate. There are "period time charters" for a specified period of time, and "trip time charters," which provide for one or two voyages, to be performed on time charter terms. A "time charter equivalent" converts a voyage charter freight rate to a time charter daily hire rate by calculating the gross freight revenue that would be earned over the course of a charter, deducting the ship owner's variable costs, such as

fuel and port costs (as opposed to fixed overhead costs such as crew wages) and dividing the resulting net revenue by the days in the voyage under consideration. Under a time charter, the charterer, not the ship owner, would pay for the variable costs, so the hire rate is net to the owner.

7.  Calculations such as the following are done by charter brokers and ship operators on a daily basis in determining anticipated voyage profits.

8.  The voyage would have occupied about 12 days for two loadings, plus 36 days for two dischargings, plus 4 days for two Bosporous transits, plus 3 days for four Suez transits, plus 15 days at sea from Port Said back to Port Said, for a total of 70 days.

9.  At a stowage factor of 51 m.t./cubic foot, the cargo quantity would have been approximately 37,500 m.t. on each voyage. The gross revenue would have been:

| | |
|---|---|
| Ballast bonus: | $  200,000 |
| Voyage 1: 37,500 m.t. at $45: | 1,687,500 |
| Voyage 2: 37,500 m.t. at $45.50: | 1,706,250 |
| Total revenue: | $3,593,750 |

10.  The expenses of the voyages would have been:

| | |
|---|---|
| Four Suez Canal transits: | $  580,000 |
| Two Bosporus transits: | 30,000 |
| Odessa port expenses twice for six days: | 120,000 |
| Jeddah port expenses twice for 18 days: | 90,000 |
| Miscellaneous costs for two trips: | 40,000 |
| IFO for 15 days at 27 m.t. and $450/m.t.: | 182,250 |
| MGO for 70 days at 3 m.t. and $725/m.t.: | 152,250 |
| Total expenses: | $1,194,500 |

11.  The net revenue would have been $3,593,750 - $1,194,500 = $2,199,250.

12.  The time charter equivalent would have been $2,199,250 ÷ 70 days = $34,275 per day.

128872.00601/6610627v.1

13.     As previously stated, the freight market rose steeply after the charter was made. Exhibit 2 hereto is a graph published by an American maritime market research firm, Maritime Research, Inc., which depicts the average charter market rates for handy-sized dry cargo vessels, which is the category in which the CAMEL falls. The upper line represents the year 2007. This graph is consistent with my own experience in the charter market during the period of time in question. The graph shows that the average charter market rate was about $38,000 per day at the beginning of August 2007. By the end of August, when the CAMEL charter was made, the average weekly rate was about $43,500. That climb progressed steeply through September, reaching an apex of about $57,000 in the third week of September. It then fell to about $48,000 at the beginning of October (which was nevertheless higher than the time charter equivalent rate under the Transgrain charter of the CAMEL), and then rose even more abruptly during October, reaching a new high of about $62,500.

14.     Exhibit 3 hereto is a list of reported fixtures (*i.e.* charters) of handy sized vessels published by Maritime Research Inc. Listed below are representative fixtures which fairly reflect what the CAMEL would have earned if fixed in the same time frame. I specify only time charters, to avoid the necessity of calculating a time charter equivalent for the few voyage charters contained in Ex. 3. I exclude charters for a period of more than six months because the daily rates for such charters tend to be lower than the rates for a time or trip charter occupying only a few months.

| Week ending | Vessel | Deadweight | Daily hire |
| --- | --- | --- | --- |
| Sept. 8 | UNION RANGER | 45,621 | $66,000 |
| Sept. 8 | XING QIANG | 45,732 | $55,000 |
| Sept. 15 | STOVE TRANSPORT | 46,223 | $59,000 |
| Sept. 15 | ORIENTAL | 43,917 | $52,000 |
| Sept. 15 | EUGENIA B | 46,750 | $65,000 |
| Sept. 15 | ENTERPRISE | 45,572 | $52,000 |

128872.00601/6610627v.1

| Sept. 15 | KOLOCEP        | 41,712 | $54,000 |
| Sept. 15 | SHOU CHANG HAI | 45,149 | $49,000 |
| Sept. 22 | PRETTY LADY    | 43,648 | $63,000 |
| Sept. 22 | YONG AN 3      | 44,109 | $62,500 |
| Sept. 29 | ARHIMIDIS SB   | 45,320 | $55,000 |
| Oct. 6   | DUBAI FORTUNE  | 42,850 | $55,000 |
| Oct. 6   | NINA           | 43,188 | $52,000 |
| Oct. 6   | DARYA RANI     | 45,654 | $60,000 |
| Oct. 6   | LAKE GLOBE     | 43,246 | $57,000 |
| Oct. 6   | MAHA DEEPA     | 45,501 | $49,000 |
| Oct. 6   | MING HAI       | 45,593 | $48,000 |

15. In my opinion, there is no reason the CAMEL could not have earned at least $50,000 per day on substitute business fixed in September or October.

16. I have been informed that the ship owner alleges it took about 15 days after the voyage in question would have begun (which was September 20 to 30) for it to commence substitute employment. For the 55 days the ship would have been employed on that substitute business out of the 70 day period it would have been employed under the Transgrain charter, the net earnings should not have been less than $50,000 x 55 days = $2,750,000, in comparison to the net earnings of only $2,199,250 that would have been earned under the Transgrain charter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Colombes, France this 12 day of February 2008.

KATRAKIS IRAKLIS

128872.00601/6610627v.1