BLANK ROME, LLP
Attorneys for Defendant
Transgrain Shipping (Singapore) Pte. Ltd.
Jack A. Greenbaum (JG 0039)
405 Lexington Ave.
New York, N. Y. 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GRANVILLE NAVIGATION S.A.

        Plaintiff,               07 CV 9823 (CM)

    - v −

TRANSGRAIN SHIPPING (SINGAPORE)
PTE. LTD.

        Defendant.

---

## DEFENDANT'S REPLY MEMORANDUM IN
## SUPPORT OF MOTION TO REDUCE ATTACHMENT

### PRELIMINARY STATEMENT

Plaintiff's opposition to Defendant's motion to reduce the amount of the attachment acknowledges that the fundamental rule of damages is as stated in the Declaration of barrister Timothy Hill:  to place a ship owner in the same financial position it would have been in if the charter party had been performed, by calculating what the ship owner would have earned under the unperformed charter and deducting what it actually earned in the same period of time the unperformed charter would have occupied. (Stavropoulou Decl. ¶ 9; Hill Decl. ¶¶ 9-13.) See The Noel Bay, [1989] 1 Lloyd's Rep. 361, 363 (Court of Appeal 1988)

In a gesture toward that end, Plaintiff has produced the first charter party (hereafter the "Delta Charter") it performed in substitution for the unperformed charter (hereafter the

"Transgrain Charter"). However, the Delta Charter, which commenced at the same time and place as the Transgrain Charter was to commence, occupied only 47 days.[1] The two voyages under the Transgrain Charter would have occupied 72.4 days by Plaintiff's own estimate. (Stavropoulou Ex. 5 and 6.) That left 25.4 additional days after the end of the Delta Charter available to Plaintiff to continue mitigating its damages in a rising charter market.

Therefore, either the attachment should be vacated because Plaintiff has failed to adduce the prime facie evidence of its damages, or else Plaintiff should be required to produce the charter party it performed following the Delta Charter, as well as the documents showing the duration of that charter and the revenues and expenses thereunder, so it can be determined what prima facie damages were incurred, if any. (Defendant's counsel asked Plaintiff's counsel for this information on receipt of Plaintiff's opposition papers. To date, no response to that request has been received.)

Contrary to Plaintiff's assertion (Pl. Mem. at 1), Defendant's motion did not criticize Plaintiff's mitigation efforts. Defendant had no knowledge whatsoever what Plaintiff did to mitigate its damages. We requested that information prior to the motion, and again in the motion. Plaintiff's opposition papers contain part of that information, but far from all of it.

On this motion, Defendant makes no comment regarding the adequacy of mitigation of damages, because we recognize the Court is not in a position to decide how much the ship should have earned on a substitute charter. However, this is not to be deemed a concession that Plaintiff properly mitigated its damages, which is a matter reserved for the arbitration.

---

[1] The Transgrain Charter was to begin at the Black Sea load port of Novorossiysk with laycan of September 20-30. (Iraklis Ex. 1.) ("Laycan" is short for "laydays/cancelling." "Laydays" refers to the earliest date the charterer is required to accept the ship on charter. "Cancelling" refers to the latest date the ship owner may tender the ship, after which the charterer can cancel the charter. See Stavropoulou Ex. 4, printed charter terms, clause 6.) The ship arrived at the same load port for Delta, Novorossiysk, on September 26, within the Transgrain Charter laycan. (Stavropoulou Ex. 7, p. 1.)

2

## ARGUMENT

### POINT I

### THE DAMAGES IN THE COMPLAINT ARE INCORRECT AS A MATTER OF LAW

The claims itemized in the Complaint are (a) a ballast bonus of $200,000, plus (b) a Suez Canal transit fee of $140,582 sailing northbound from the discharge port under the previous charter to the loading port of Novorossiysk, plus (c) fuel consumed on that northbound voyage in the amount of $188,706, plus (d) lost profits for 14.839 days "for the period of time during which the vessel was unemployed" and Plaintiff sought a substitute charter, in the amount of $408,047.45. (Molina Decl. Ex. A ¶ 9.)

### A. There was no "unemployment" before the Delta Charter commenced.

A period of unemployment would properly be encompassed in a claim calculation **if** "unemployment" refers to a difference between the time the ship would have commenced performance of an unperformed charter and the actual time it began performance under a substitute charter, which is what Defendant assumed the Complaint referred to.[2]    However, Plaintiff's opposition papers disclose for the first time that there was no period of unemployment between the intended start of performance of the Transgrain Charter and the actual start of performance of the Delta Charter because both charters were to commence at the same port on the date the ship actually arrived there.  Performance of a voyage charter commences when the ship tenders Notice of Readiness at the loading port, and the ship earns the freight only upon

---

[2] As the Transgrain Charter was cancelled two days before the earliest layday of September 20, it was possible the Complaint meant that it took 15 days after September 20 before the ship commenced performance of a substitute charter.  However, Plaintiff's opposition papers now show that the substitute charter was made on September 20 and its performance was commenced on September 26, the same day and at the same port that the Transgrain Charter would have commenced.

loading. No revenue is earned before a ship arrives at the loading port to commence performance of a voyage charter, and therefore there is no loss of profit before that time.

Expressed another way, the same so-called "unemployment" prior to arrival at the load port would be incurred under either charter, because performance of both charters required the same ballast voyage from the last discharge port under a previous charter to the same load port at the same time.

If the ship was on a cargo-laden voyage while en route to the Black Sea, it could not be said it was already employed on its next voyage for Transgrain or Delta. It makes no difference if a ship is proceeding in ballast to the load port or with cargo; it still has not been delivered or commenced performance under its next voyage charter until it is ready to load the next cargo.

Therefore, this claim is indeed frivolous, based on the undisputed facts.

Further, it appears Plaintiff's claim counts the 14.839 days of "unemployment" from a completely arbitrary date of September 7 until the date the Delta Charter was made on September 20.[3] But the ship was not going to be employed or earn any money under either charter until Notice of Readiness was tendered at Novorossiysk, which actually occurred on September 26. (Stavropoulou Ex. 7.)

Thus, there was no period of unemployment before September 26 that would not also have been incurred if the Transgrain Charter had been performed. This is an indisputable fact, which does not involve any fact intensive inquiry by the Court.

---

[3] Plaintiff's calculation of loss states the ship was delivered to Transgrain on September 7. (Stavropoulou Ex. 7, p. 2.) Obviously, that is wrong. The ship was never delivered to Transgrain, as that charter was unperformed. If the Transgrain Charter had been performed, performance would have commenced the same date the ship was actually delivered to Delta, September 26.

Similarly, the September 20 date the Delta Charter was fixed (*i.e.* made) has no bearing, contrary to what is suggested in Plaintiff's computation of the 14.8 days. (*Id.*) The Delta employment began at Novorossiysk on September 26.

4

**B.**    **The northbound Suez Canal and fuel costs are expenses to be accounted for in the calculation of voyage profits; they are not separately recoverable items.**

As a matter of law, the northbound Suez Canal and fuel expenses are not recoverable as separate items of damage, but must be accounted for in the calculation of the net profit on both the unperformed voyage and the substitute mitigation voyage in order to put Plaintiff in the same financial position it would have occupied if the Transgrain Charter had been performed. (Hill Decl. ¶ 16.) Plaintiff's English attorney admits that barrister Hill and <u>Voyage Charters</u> are correct in stating the fundamental law. (Stavropoulou Decl. ¶ 9.) As stated in the English law section of J. Cooke, *et al*, <u>Voyage Charters</u> (3d Ed. 2007), at p. 607:

> The expense incurred in proceeding to the loading port under a substitute charter is treated <u>as part of the expense of the substitute voyage and is brought into account in arriving at the overall result of that voyage</u>; and that is so even if the vessel is at the loading port under the original charter but needs to proceed to a different loading port under the substitute charter. (Underscoring added.)

More directly to the point, in <u>The Noel Bay</u>, the Court of Appeal stated: "They [ship owner] <u>cannot claim separately for the $17,444 expenses of the ballast voyage</u>." (Underscoring added.) [1989] 1 Lloyds Rep. at 367.

Ms. Stavropoulou asserts the costs of proceeding to the load port can be claimed separately merely because they were actually incurred. (Stavropoulou ¶ 12 (i) and (ii).) Ms. Stavropoulou offers no <u>legal</u> basis for saying that and does not explain how that would put Plaintiff in the same financial position, rather than put Plaintiff well ahead, in comparison to what it would have earned under the Transgrain Charter. Plaintiff is required to support its claim with applicable law. <u>OGI Oceangate Transportation Co. Ltd. v. RP Logistics Pvt. Ltd.</u>, 06 Civ. 9441(RWS), 2007 U.S. Dist. LEXIS 46841, *14-15 (S.D.N.Y. June 26, 2007), <u>reconsideration denied</u>, 2007 U.S. Dist. LEXIS 74180 (S.D.N.Y. Oct. 4, 2007). Plaintiff has offered no case law

5

or any other authority to contradict the law quoted above, and therefore has not carried its burden to show it has a valid separate claim for the northbound expenses.

Further, it misses the point for Ms. Stavropoulou to say that the Suez Canal and fuel costs are separately recoverable merely because they were actually incurred.  Mr. Hill's Declaration and The Noel Bay decision assume the costs were incurred, but the point is one of law:  These are costs the ship owner incurred in getting to the load port and would have incurred in getting to the same load port to perform the Transgrain Charter.  Therefore, they are not separately recoverable, but only accountable as costs in determining the profits under each of the charters. (Hill Decl. ¶ 16.)

## C.  The ballast bonus is different from the Suez and fuel costs.

Mr. Hill points out that the ballast bonus arguably is distinguishable from the Suez Canal and fuel costs because the Transgrain Charter stipulated the ballast bonus was to be paid to Plaintiff.  It is nevertheless his view that the ballast bonus should be treated the same as the freight that is to be paid to the Plaintiff, and accounted for in the calculation of lost profits, not as a separate item of claim.  While Defendant strenuously disputes that the ballast bonus can be treated as a separately recoverable item, we will reserve that position for the arbitration. Defendant withdraws its motion with respect to this particular $200,000 item, inasmuch as barrister Hill indicated there is no clear cut English law on the point.

## POINT II

### PLAINTIFF HAS NOT ACCOUNTED
### FOR 25 DAYS OF MITIGATION REVENUE

Since performance of the Delta Charter began on September 26 at the same load port the Transgrain Charter was to begin, Novorossiysk, (Stavropoulou Decl. Ex. 4, p. 2 [email fixture confirmation] and Box 5 of the signed charter, and Ex. 7, p. 1; Iraklis Ex. 1, p. 3), it is easy to

identify the relevant period of time to consider in determining the mitigation revenues, *i.e.* 72.4 days beginning September 26.

The ship completed the Delta Charter upon sailing from the discharge port of Alexandria on November 12. (Stavropoulou Decl. Ex. 7, p. 1.) Thus, the voyage for Delta occupied 47 days from September 26 to November 12.[4]

According to Plaintiff, the two voyages that were to have been performed under the Transgrain Charter would have occupied 72.4 days (which is similar to the 70 day estimate by Mr. Iraklis). (Stavropoulou Decl. Exs. 5 and 6 [41.4 days + 32 days].)

As stated by Mr. Hill, if a substitute charter (or, as it has turned out in this case, two consecutive substitute charters) are for a longer period than the unperformed charter, the substitute revenues must be apportioned to the time when the unperformed charter would have been completed. (Hill Decl. ¶ 12.) This is done by calculating a daily Time Charter Equivalent rate ("TCE") for both the unperformed charter and the substitute charter(s) and applying the daily difference in TCEs to the number of days the unperformed charter would have occupied. The method of computing a TCE was explained by Mr. Iraklis.

Although Defendant does not agree with many of the figures Plaintiff used to calculate the TCE in Stavropoulou Exs. 5 and 6, we will use those figures for present purposes in order to avoid issues of fact on this motion. Defendant, of course, reserves it right to arbitrate what facts and figures are correct and relevant. On the other hand, it is a matter of law that the costs of getting to the load port must be included in the calculation of the voyage profit and TCE on both

---

[4] For some unexplained reason, Plaintiff counts time from September 20 to calculate a 53 day Delta voyage and a consequently smaller TCE. However, September 20 was merely the date the Delta Charter was made and was not a part of the voyage. By the logic of counting from the charter date, the Transgrain charter dated August 29 would have been nearly a month longer than it would by counting from the date the voyage would have commenced on September 26, and the TCE would have been that much lower, minimizing if not obviating any damages in comparison to the Delta Charter TCE.

7

the unperformed voyage and the substitute voyage, *supra*, so we add those to the expenses in Stavropoulou Exs. 5, 6 and 7.

Plaintiff calculates the profit on the Transgrain Charter would have been $940,533 on the first voyage and $958,304 on the second voyage, for a total profit of $1,898,837. (Stavropoulou Exs. 5 and 6.) Deducting the Suez Canal costs of $140,582 and the northbound fuel costs of $188,706 reduces that profit to $1,569,049. Dividing that by the 72.4 day estimated duration, the TCE was $21,672 per day.

Plaintiff calculates the profit under the Delta Charter was $1,125,537. (Stavropoulou Ex. 7, p. 1.) Deducting the same northbound Suez Canal and fuel costs reduces that to $796,249. Divided by the 47 days of the Delta voyage, the TCE was $16,941 per day.

The difference between the TCEs is [$21,672 - $16,941 =] $4,731. Thus, Plaintiff's loss during the first 47 days was [$4,731 x 47 =] $222,357.

The net revenue Plaintiff earned in mitigation during the remaining 25.4 days must also be taken into account in determining its damages. For example, if Plaintiff earned a TCE of as little as $30,000 per day, it will have sustained no damages.[5] A TCE of $30,000 would exceed the Transgrain TCE of $21,672 by $8,328 per day. Over the remaining 25.4 days that the ship would have been employed on the Transgrain Charter, Plaintiff's net revenue would have exceeded the anticipated Transgrain Charter revenue by [$8,328 x 25.4 =] $211,531. That would almost entirely off-set the loss during the first 47 days.

It is not Defendant's purpose in the foregoing discussion to guess at the amount of Plaintiff's true damages, if any, or to ask this Court to resolve issues of fact. Rather, it is Defendant's purpose to demonstrate that it is entirely possible, if not likely, that Plaintiff did not sustain any damages at all, and it is certain that any damages were far less than the $937,335

---

[5] Mr. Iraklis testified the ship could easily earn a TCE of $50,000. (Iraklis Decl. ¶ 15)

8

principal amount in the Complaint. Defendant has thus shown good cause to reduce the amount of the attachment, as required by Supplemental Rule E(6). Plaintiff, on the other hand, has not refuted that showing because it only disclosed part of its mitigation revenues.

### POINT III

### IT IS PLAINTIFF'S BURDEN TO ADDUCE<br>PRIMA FACIE EVIDENCE OF ITS DAMAGES

Defendant has demonstrated that the claim for "unemployment" prior to September 26 is frivolous because it is an indisputable fact that there was no such unemployment. The ship was never to have been "employed" under either charter prior to September 26. If the ballast voyage were viewed as "unemployment," the same ballast voyage and "unemployment" had to occur no matter which of the two charters was performed.

Additionally, Defendant has demonstrated as a matter of law that the northbound Suez Canal and fuel costs are not recoverable as separate items of claim.

If Plaintiff insists on erroneously standing upon these claims, the attachment should be reduced to $200,000 for the ballast bonus alone.

If Plaintiff wishes to amend its claim to the amount of profit lost, if any, during the period of time the Transgrain Charter would have taken, it is required to show what that loss was. However, Plaintiff has not shown what it earned during the 25.4 days after the Delta Charter was completed, which very likely reduced or obviated the loss during the first 47 days under the Delta Charter. As Plaintiff has failed to show what its damages were, the attachment should be reduced to $200,000 for the ballast bonus alone.

Plaintiff is not correct in arguing that it may stand on its Complaint alone to make out its prima facie case of damages. Challenging the amount of an attachment is not governed by Rule

9

E(4)(f), as Plaintiff's brief correctly says. <u>Aqua Stoli's</u>[6] discussion of a <u>prima facie</u> claim was in the context of whether a complaint states a valid cause of action within the admiralty jurisdiction, as required by Rules B and E(4)(f). Rather, a challenge to the amount of the claim is governed by Rule E(6) and its good cause standard.

As Defendant has shown good cause to challenge the amount of the claim, Plaintiff is required to adduce evidence of its damages. <u>The Rice Company v. Express Sea Transport Corp.</u>, 07 CIV 7077 (WHP), 2007 U.S. Dist. LEXIS 84300, *8 (S.D.N.Y. Nov. 15, 2007). Plaintiff has not done so, and the attachment therefore should be reduced to $200,000 for the claim for the ballast bonus alone. Alternatively, Plaintiff should be required to adduce the relevant evidence regarding the ship's employment after the Delta Charter.

**CONCLUSION**

**THE ATTACHMENT SHOULD BE VACATED OR REDUCED**

Dated: New York, N. Y.
     March 4, 2008

> Respectfully submitted,
>
> BLANK ROME LLP
> Attorneys for Defendant
>
> By _____
>    Jack A. Greenbaum (JG-0039)
>    405 Lexington Ave.
>    New York, N. Y. 10174
>    (212) 885-5000

---

[6] <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.</u>, 460 F. 3d 434 (2d Cir. 2006).

128872.00601/6621047v.1