United States District Court
Southern District of New York

Granville Navigation S.A.
    Plaintiff
(CM)

07   CV   9823

v

Transgrain Shipping (Singapore) Pte Ltd
    Defendant

### SECOND DECLARATION OF MARIA STAVROPOULOU

I am preparing this declaration in reply to the Defendant's Reply Memorandum in Support of Motion to Reduce Attachment dated 4th March 2008, and would like to state the following:

1) The Delta Charterparty was the only charterparty which had been fixed by the Owners – there was not any other fixture within the estimated duration of the Transgrain charterparty (had this been completed).

2) The Defendants' lawyers have erroneously assumed that the charterparty with Transgrain would have commenced at the same time as the Delta charterparty. This is clearly wrong for 2 reasons:

   a) If, as the Defendants allege, the Transgrain charterparty had not yet commenced as at the date of cancellation on 18th September, then there would not have been a claim pending against the Defendants in London arbitration for wrongful cancellation. The Defendants' allegation cannot therefore be right. The Charterparty started running as soon as the vessel left the Port of Dahej in India to sail to the Black Sea. In addition, it was an obligation of the Charterers under that contract that they would pay the Owners a ballast bonus of USD 200,000. It is submitted that no liability would have arisen on the part of the Defendants if the Charterparty had not commenced.

   b) The Defendants are obviously confusing the issue regarding the time when the Vessel starts earning <u>freight</u> with the time that the charterparty commences. The two are different concepts which shall be discussed and resolved in arbitration.

3) In accordance with the above and our evidence as submitted in my original declaration and that of Mr. Thomas Gazis, both dated 28th February 2008, the Delta Charterparty did not last for only 47 days but

1

it had lasted for a total of 54 days (that is between 20/09/07 and 12/11/07).

4) We concur with the Defendants in that the Transgrain Charterparty would have lasted for a total period of about 72.4 days. For ease in comparison, we have rounded this period to 70 days as suggested by the Defendants' expert Mr Katrakis in his declaration. The Delta Charterparty lasted for a total of 54 days (please refer to Attachment 7 of my original declaration). When we add these 54 days to the total number of days lost due to Transgrain's wrongful cancellation and time spent until the re-fixing of the Vessel, of 14,8 (say 15) (please refer to Exhibit 8 of my previous submissions) the total is 69 days. This shows that in practice the Transgrain Charterparty would have been completed at around the same time (that is in 1 day later) as the Delta Charterparty. For practical purposes we felt that it would not be worthwhile to take into consideration this one day when computing the total loss of profit (termed "Total loss of Hire" in Exhibit 8 of my previous submissions) and as such the total losses were calculated on the basis of a total duration of approximately 69 days.

We further reply to the Defendants' assertions in each of their arguments as follows:

Argument 1A

5) With regards to the Defendants' argument that the period of 14.8 days lost between the Vessel's departure from Dahej until the re-fixture with Delta cannot be regarded as a "period of unemployment", we would like to state that this cannot be right for reasons explained below.

6) According to English law, the chartered service commences when the vessel starts her approach voyage to the loading port. This was the basis of choosing 7th September as the commencement date of the Transgrain charterparty. We were referring to this commencement date when stating that "the ship was **delivered** to Transgrain on September 7". The 7th September was under no circumstances an arbitrary date. Once the approach voyage had commenced, the Owners' obligation was to proceed with reasonable despatch to the port of loading in the Black sea, which they did. Although the English courts have not yet given a definitive answer for the commencement time of the approach voyage, the general view that they have so far taken is that in a typical charter when the Owner has an obligation to "proceed to the loading port", the commencement of the approach voyage is taken to be the time when the Vessel is free of her previous engagements and is proceeding to the loading port for the purpose of loading the cargo (Voyage Charters, Third Edition, page 98). The authorities for this proposition are the 19th century cases of: Harrison v. Garthorne (1872) 26 L.T. (N.S.) 508; Hudson v. Hill (1874) 43 L.J.C.P 273; Barker v. Windle (1856) 18 C.B. (N.S.) 759.

7) This is precisely our point here: the Vessel was free of her previous employment at the port of Dahej and that is when the chartered service commenced whereby the Owners promised under the charterparty to proceed with reasonable despatch to the loading port at Novorossiysk in ballast and the Charterers had undertaken under the charterparty to pay to the Owners a ballast bonus USD 200,000. It is therefore our position that under English law what the Defendants are postulating has no legal standing.

8) For the reasons stated above we maintain our calculation for loss of profits (termed "loss of hire") as shown in Exhibit 8 of my original declaration.

Argument 1B

9) The Defendants are alleging that "as a matter of law, the Northbound Suez Canal and fuel expenses are not recoverable as separate items of damage". This is indeed incorrect for the following reasons:

   (i) The Noel Bay case that they are citing (please see attached) is clearly distinguishable on its facts and cannot apply here. In that case, the Vessel was fixed for a voyage from "a port or ports on the west coast of Italy (including Italian islands) to a wide range of European ports". When the Vessel finished her previous employment at Malta, the Charterers were obliged to give orders for a loading port, as per the agreed terms under the charterparty, but they failed to do so. On the following morning, the Owners decided to sail to Augusta (Sicily) where they had arrived in the same afternoon. A day later the Charterers cancelled the charterparty by giving notice to the Owners to that effect. Two days later the Owners found substitute employment for their Vessel, for the carriage of cargo from Tuapse (on the eastern shore of then Black Sea) to Bania in Syria. They then claimed for the expenses incurred in the substitute ballast voyage from Augusta to Tuapse and the Court decided that these could not be recovered separately. **This is irrelevant to the case under discussion.**

   (ii) In the present case, the bunkers consumed and the Suez Canal dues had been incurred and paid for by the Owners as part of the original Transgrain charterparty- NOT A SUBSTITUTE charterparty as in The Noel Bay case. These expenses went "part and parcel" with the Transgrain Charterparty since they would not have been incurred if the Charterers had not agreed to nominate a port in the Black Sea (considering that the route from India to the Black Sea meant that fuel expenses would have been incurred and the Suez Canal dues paid well in advance as provided for by local Egyptian regulations).

3

    (iii)    It is to be noted that all the expenses incurred in the Substitute charterparty- which in this case was the <u>DELTA Charterparty</u> are <u>not</u> claimed separately and have been taken into account in calculating the TCE for the Delta voyage as shown in Exhibit 7 of my original declaration. Therefore the Owners have calculated their damages claim in accordance with trite English law principles.

10) The Charterers are similarly wrong in using the extract from the Voyage Charters (at page 607) in asserting that " *the expense incurred in proceeding to the loading port under a substitute charter is treated as part of the expense of the substitute voyage and is brought into account at the overall result of that voyage*" because the additional amounts claimed for the northbound voyage as explained above DO NOT relate to the substitute voyage- they were part of the <u>original Transgrain charterparty</u> which had been wrongfully cancelled by the Charterers. We agree with the extract from Voyage Charterers in calculating profit incurred under the substitute charterparty with Delta, and indeed we applied those principles in calculating the TCE for the Delta charterparty as shown in Exhibit 7 of my original declaration.

11) Based on the above, we conclude that <u>The Noel Bay</u> concerned a different situation thus the facts of that case are clearly distinguishable from the facts in the present case. Furthermore, the Charterers have misinterpreted the law as stated on page 607 of Voyage Charters.

<u>Argument 1C</u>

12) We note the Defendants' motion of withdrawal with respect to the recovery of the ballast bonus at US$200,000.

<u>Argument 2</u>

13) For the reasons stated in paragraphs 5 to 7 above, the Defendants have used the wrong dates to represent the commencement date of each particular voyage in their calculations in this part of their Reply Memorandum.

14) As explained above, the commencement date for the first Transgrain voyage should be the 7th September since this was the date that the Vessel was free from its previous employment (was discharging cargo at Dahej under a previous charterparty) and was ready to proceed on its approach voyage to the loading port at the Black Sea. The date COULD NOT be the date of the charterparty with Transgrain on 29th August (as suggested in the Defendants' footnote 4 on page 4 of their Reply) since the Vessel had not been free from her employment then.

15) For the same reasons, the commencement date for the Delta charterparty is clearly as previously stated the 20th September and not the 26th September as suggested by the Owners. This is because on the 20th September when the Vessel was fixed with Delta (the date of

the charterparty) she was free of her previous employment (following Transgrain's cancellation of the charterparty) and was proceeding to the loading port at the Black Sea on its approach voyage. These principles are very clear and show that the commencement dates computed by the Owners for this and the Transgrain charterparties were based on the principles of English law.

16) It is further noted that the Defendants are contradicting themselves in making completely erroneous calculations on their page 8 which are against the principles of English law as explained by Mr Tim Hill in support of their previous submissions and by my declaration of 28th February 2008. More particularly:

a) The TCE for the first and second Transgrain voyages (please refer to Attachments 5 and 6 of my original declaration) was calculated by deducting the expenses which would have been incurred from the freight that would have been earned for each voyage. These were estimated costs for the whole of the two voyages. These expenses are completely unrelated to the Suez Canal costs of $140,582 and the fuel costs at $188,706, which had been actually incurred and paid for and are claimed for separately by the Owners. The TCE calculation aims at estimating the total loss of profit to the Owners per day.

b) For the same reason the Defendants are wrong in deducting the Suez Canal costs of $140,582 and the fuel costs at $188,706, in calculating the profit for the Delta charterparty since these are completely unrelated. The DELTA charterparty had actual expenses which are listed in the calculation for the Delta profit in Exhibit 7 of my original declaration.

c) Furthermore, when calculating the loss of profit incurred the Defendants are wrong in calculating the average TCE for the first and second Transgrain voyages and multiplying by the number of days of entire voyage since the average should only apply in calculating the difference in losses from the point that the Vessel was fixed with Delta. More particularly:

   I. The profit losses (termed "Loss of hire") for the first 14.83 days (say 15 days) – that is the period from the commencement of the first Transgrain Voyage until the date of refixing the Vessel with Delta) – are calculated by multiplying the TCE for Transgrain Voyage 1 by the 14.83 days.

   II. The profit losses for the estimated remaining period that the Transgrain charterparty would have taken was calculated by multiplying these days (a total of 54 days) by **the difference between** the profit that would have been earned under the Transgrain charterparty and the profit that was earned under the Delta charterparty- the respective amounts being the <u>average</u> TCE for the Transgrain charterparty and the TCE for the Delta charterparty.

    III. The result of the above calculation comes up to US$612,119 as set out in Exhibit 8 of my original declaration.

17) Based on the above analysis it is clear that the Defendants have failed to apply the principles of English law in calculating the correct commencement date of the charterparties under discussion and also have miscalculated the TCE for each charterparty resulting in the erroneous calculation of losses incurred to Owners due to the cancellation of the charterparty.

Argument 3

18) It is therefore clear that the Plaintiffs' claim for "unemployment" prior to the 26th September is not frivolous. The same applies to the Plaintiff's claim for the northbound Suez Canal and fuel costs- these are NOT frivolous. In contrast, the Plaintiff's claim for these and the other amounts claimed in Exhibit 8 of my original declaration is reasonable and has been calculated in accordance with English law principles.

19) It is therefore grossly unfair for the Defendants to claim that the attachment should be reduced to US$ 200,000 for the ballast bonus alone. The Plaintiffs should be entitled to maintain the attachment order for a total amount of damages due to them from the Defendants at US$ 1,141,407 as set out in Exhibit 8 of my original declaration.

Pursuant to 28 U.S.C. (paragraph 1746), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Piraeus, Greece this 17th day of March 2008.

MARIA STAVROPOULOU

6

approach voyage commences, did not apply to exceptions in favour of the charterer. However, it is submitted that it is unnecessary and undesirable to draw this distinction. The reason why the owners could not rely on the exceptions clause in *Monroe v. Ryan* was not that the excepted peril manifested itself before the approach voyage began; it was that the delay in question was delay to the intermediate voyage, the late arrival of the vessel at the loading port being no more than an inevitable consequence of that earlier delay.

The effect of clause 2 of the Gencon charter upon the owner's liability for failure to proceed to the loading port in time is discussed in Chapter 11.[36]

*When and where does the approach voyage begin?*

**4.17** It will be apparent from the above that the point at which the approach voyage begins may be a matter of considerable importance, since delay up to that point will, under many forms of charter, be entirely at the owner's risk, whereas once the approach voyage has commenced the owner's obligation is to proceed with reasonable despatch in the circumstances, and he will normally be entitled to rely on excepted perils. None of the authorities attempts to provide a definitive answer to the question where and when the approach voyage begins, and the answer ultimately depends upon ascertaining the point of time at which the ship embarks upon the chartered service as defined in the charter.[37] However, the decided cases make it clear that, under a typical charter form such as the Gencon, where the owner's initial obligation is to "proceed to the loading port" the point will not normally arrive until the vessel is free of her previous engagements or dry docking[38] and is proceeding to the loading port for the purpose of loading the cargo. As *Evera v. North Shipping*[39] demonstrates, the mere mention in the charter, even in some detail, of the vessel's previous engagement does not render it part of the chartered service. By contrast it has been held that the exercise by the owner of a liberty, granted by the charter, to take a cargo on the voyage to the loading port will not prevent that voyage from being considered part of the service.[40]

**4. Post-fixture notices of expected time of arrival**

**4.18** Some forms of charter, usually those which contain no "expected ready to load" date in the charter itself, contain a requirement that the master or owners shall serve notices on the charterer at a specified time or times before the anticipated arrival of the ship at the loading port. There is scant authority on the effect of such provisions, but the analogy with the "expected ready" date in the charter itself suggests that the date in the notice must be given honestly and on reasonable grounds. If the date stated in the notice is not based on a reasonable assessment of the probable arrival date, the owner will be liable in damages. However, since the notice involves no promise that the vessel will arrive on the stated date, the damages to which the charterer is entitled in the event of a breach, are, it is submitted, those which will put him in the same position as if a proper notice (i.e. notice stating a realistic date of arrival) had been given rather than those which will put him in the same position as if the vessel had arrived on the date stated in the notice (plus any appropriate allowance for unforeseeable delays). This approach is

---

36. Paras. 11.68 and 11.72 *et seq.*
37. The principles are discussed in *Barker v. Windle* (1856) 18 C.B.(N.S.) 759, *Harrison v. Garthorne* (1872) 26 L.T.(N.S.) 508 and *Hudson v. Hill* (1874) 43 L.J.C.P. 273.
38. As in *Hudson v. Hill* (1874) 43 L.J.C.P. 273. However, the need to carry out routine repairs on the voyage to the loading port or on arrival there would presumably not prevent the commencement of the approach voyage.
39. See para. 4.13, above.
40. *Harrison v. Garthorne* (1872) 26 L.T.(N.S.) 508; *Hudson v. Hill* (1874) 43 L.J.C.P. 273.